IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>APPROXIMATELY $44,888.35 IN U.S. CURRENCY, et al.,<br><br>        Defendants. | CIV-S-04-0204 DFL DAD<br><br><u>MEMORANDUM OF OPINION<br>AND ORDER</u> |

    This civil forfeiture action arises out of the criminal investigation and prosecution of Scott Poll and his company, Red Rock, LLC ("Red Rock"), for a scheme to defraud cable operators by selling illegal cable descramblers. The United States seeks forfeiture of approximately $44,888.35 in funds seized on December 3, 2003 ("defendant funds") from one of Red Rock's bank accounts. North American Bancard ("NAB") filed a verified claim to a portion of the defendant funds, which the government now moves to dismiss. For the following reasons, the court GRANTS the government's motion to dismiss.

I.

The defendant funds were seized on December 3, 2003 pursuant to a federal seizure warrant. (Mot. at 3.) The government alleges that the defendant funds represent the proceeds of specified unlawful activity and are, therefore, subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C). (Id.) Specifically, the government contends that the defendant funds are the proceeds of the sale of cable descramblers, often purchased over the internet by individuals using a credit card. (Id. at 2-3.) The government also alleges that the funds were involved in, or traceable to, violations of 18 U.S.C. § 1956(a)(1)(A)(I) (money laundering) and are, therefore, subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

NAB has filed a verified claim to $35,239.89 of the defendant funds. NAB is a third-party intermediary for merchants who are accepted into, and participate in, Global Payment Direct's ("Global") credit card program affiliated with HSBC Bank as a member of VISA USA and/or MasterCard International, Inc. (Opp'n at 1.) It is in this capacity that NAB interacted with Red Rock, which was a merchant accepted into Global's credit card program.

The basic credit card processing system works as follows. When a customer purchases a product from a merchant, such as Red Rock, with a credit card, the merchant submits these charges to Global for payment. (Id. at 2.) In response, Global places funds directly into the merchant's, in this case Red Rock's, bank

account.[1]  The charges are then reported on the statements of the individual cardholder as monies owed for charges incurred.

As part of its role in this system, NAB markets Global's credit card purchasing services to merchants, helping to pre-screen and sign-up new applicants.  (Id. Ex. A at 1.)  Once Global has accepted a merchant into its credit card processing program, NAB provides various customer services to the merchant and assists in collecting amounts owed to Global.  (Id. Ex. A at 2-3.)  Critical to this motion, NAB also plays an important role in resolving "chargebacks," which occur when a cardholder disputes a charge.

Specifically, when a cardholder informs Visa, MasterCard, and/or Global of a dispute over an unauthorized or otherwise improper charge, Global conducts an investigation of the cardholder's claim.  (Opp'n at 2.)  If the chargeback is substantiated, Global reimburses the cardholder.  (Id.)  Once Global reimburses the cardholder, it deducts the chargeback amount from its payments to NAB and assigns NAB its right to pursue collection of the chargeback from the merchant.  (Reply at 13-14; NAB's Verified Claim ¶ 4; Opp'n Ex. A at ¶ B.3-4.)  Upon the assignment of Global's collection rights, NAB has the right under the contract with the merchant to directly debit or withdraw the chargeback amount from the merchant's bank accounts.

---

[1] In its papers, NAB stated that it, not Global, placed the money in the merchant's account upon submission of credit card charges.  (Id. Ex. C at ¶ 5.)  However, at the hearing on this matter, NAB's counsel clarified that Global initially paid the money into the merchant's account, not NAB.

3

(Opp'n at 3.) Merchant authorization is not required for this debit/deduction. (Id.)

    As a result of the government's seizure of the funds in Red Rock's bank account, NAB was unable to collect from Red Rock $35,239.89 to cover chargebacks from cardholders who had purchased descramblers from Red Rock. In these cases, the cardholder purchased the descrambler prior to the seizure. However, during the time that elapsed for the processing and assignment of these chargebacks to NAB by Global, the government seized the funds in Red Rock's account, leaving NAB unable to collect from Red Rock. (Id. Ex. E.) The reasons for the chargebacks varied, including claims that: (1) that the charges were unauthorized; (2) the goods were defective; (3) the merchandise was not as described; (4) the product was returned; or (5) the cardholder never received the product. (Id.)

    On November 18, 2004, NAB filed a verified claim to $35,239.89 of the defendant funds. The government moves to dismiss or, in the alternative, strike NAB's verified claim on two grounds: (1) NAB lacks standing to bring such a claim; and (2) NAB does not qualify as an "innocent owner" within the

meaning of 18 U.S.C. § 983(d).[2]

## II.

A. Article III Standing

"In a forfeiture case, a claimant's Article III standing turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy. This threshold burden is not rigorous." See United States v. $4,224,958.57, 392 F.3d 1002, 1005 (9th Cir. 2004) (hereinafter "Boylan") (quoting United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003)). "A claimant need not prove the merit of his underlying claim. He must, however, be able to show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement." United States v. $9,041,598.68, 163 F.3d 238, 245 (5th Cir. 1998). Creditors who lack a secured interest in the specific property subject to forfeiture do not have sufficient ownership interest to contest the forfeiture of the property.[3] United States v. $20,193.39 U.S. Currency, 16 F.3d 344, 346-47 (9th Cir. 1994).

---

[2] Although the government brings this motion as a motion to dismiss, NAB has submitted material in opposition to the motion beyond the scope of its verified complaint. In light of these submissions, the court treats the government's motion as one for summary judgment. Fed.R.Civ.P. 12(c); see Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir. 2004) (stating that where party opposing summary judgment submits outside evidence, the court may convert the motion to dismiss into a summary judgment motion without providing further notice to the party).

[3] NAB argues that it need not have a perfected security interest in the specific assets to establish Article III standing. (Opp'n at 10-11.) However, as stated above, this argument is at odds with established Ninth Circuit precedent.

NAB asserts an interest in these funds based upon two theories: (1) under its contract with Red Rock and Global, it retains actual ownership of the funds deposited into Red Rock's account; and (2) it is the beneficiary of a constructive trust imposed on the defendant funds. However, neither theory is persuasive.

1. <u>Contractual Ownership Theory</u>

NAB argues that, under the terms of the merchant service agreement ("MSA") entered into between Global, NAB, and Red Rock, it retained ownership of the funds deposited into Red Rock's bank accounts until the time for customers to assert a chargeback request expired. (Opp'n at 9-10.) Specifically, NAB argues that the MSA grants NAB the unfettered right to directly debit or withdraw the charged-back funds from the merchant's account. (<u>Id.</u> at 3.) Implicit in this right to automatically debit, NAB argues, is the corresponding obligation of the merchant to hold the deposited funds in the account until the chargeback period expires. (<u>Id.</u>) NAB claims that "[i]t is universally recognized in the industry that funds deposited into the merchant's account in response to credit card charges do not belong to Red Rock until the chargeback process cleared" and that NAB remains the true owner of these funds until that time. (<u>Id.</u> Ex. C at ¶¶ 8, 10.)

NAB's argument finds no support in the terms of the MSA agreement. The contractual terms make no mention of any obligation by Red Rock to hold specific funds in its account

6

1 until the chargeback period expires.  Nor do they suggest that
2 NAB retains ownership of the funds deposited into Red Rock's
3 account.  Rather, the language speaks of Red Rock's obligation to
4 "pay" Global/NAB the full chargeback amount and states that
5 chargebacks are "charged to" the merchant's account.  (Id. Ex. B
6 at ¶¶ 5, 14.)  This suggests that when NAB places the funds in
7 Red Rock's account, Red Rock becomes the owner of these funds and
8 NAB/Global merely retains a right to recoup from Red Rock's
9 account any chargebacks incurred.

This reading of the contract is buttressed by a comparison with the optional reserve account provision in the agreement. (Id. ¶ 15.)  If a reserve account is established, the MSA grants Global/NAB a secured interest in the account, which allows Global/NAB to withdraw funds as it deems necessary and provides that any funds in the reserve account may be held until the expiration of any potentially applicable chargeback period. (Id.)  This contractual language indicates that if NAB wanted to obligate Red Rock to hold specific funds until certain chargebacks cleared and, thereby, acquire something akin to a secured interest in the specific funds, a reserve account was necessary.  NAB does not claim that the defendant funds were held in such an account.[4]

---

[4] NAB makes reference to industry policy and custom in support of its contractual theory.  However, evidence of usage or custom in the trade is inadmissible to control, vary, or contradict express terms of the contract.  Fireman's Fund Ins. Co. v. Mercer Marine Transit Corp., 136 Ga.App. 621, 621-22, 222 S.E.2d 138 (Ga.App. 1975); Varni Bros. Corp. v. Wine World, Inc., 35 Cal.App.4th 880, 889, 41 Cal.Rptr.2d 740 (1995).  If, as NAB

7

At most, then, the MSA gives NAB a secured interest in the Red Rock account from which the defendant funds were seized, but not in the actual funds. This is a critical distinction because the defendant in this case is not the Wells Fargo account, but the specific funds in the account. See United States v. Bornfield, 145 F.3d 1123, 1136 n.7 (10th Cir. 1998) (noting that bank account merely holds the property that is subject to forfeiture). Thus, even if NAB has a secured interest in the Wells Fargo account, it has not established an ownership interest in the specific funds in the account. See United States v. Approximately $178,000.00, CIV-S-03-0640 (E.D. Cal. Jan. 27, 2004) (finding that bank which held general right to reimbursement did not establish a particular claim to the actual funds in the customer account).

Additionally, under the contract, any ownership right or interest of NAB in the funds did not arise prior to the seizure. According to the terms of the MSA, NAB's contractual right to debit the account arose when it became obligated to pay certain chargebacks and credit losses to Global. (Opp'n Ex. C. at ¶ 9.) However, NAB did not become obligated to pay the chargebacks in question until after the government had seized the defendant funds. (Id. Ex. E.) Therefore, NAB's right to withdraw the

---

argues, there is an implied obligation under industry standards to hold the funds, that obligation would apply to all Red Rock accounts, not simply reserve accounts. This would make the express provisions of the reserve account clause unnecessary. Moreover, NAB's evidence in support of such a policy – one declaration from an NAB employee – is weak. Accordingly, NAB's reference to industry policy and custom also fails.

8

funds from Red Rock's account did not ripen until after the seizure and, as a result, it cannot make a specific claim to the defendant funds.[5]  See United States v. BCCI Holdings (Luxembourg), S.A., 980 F.Supp. 10, 14-15 (D.D.C. 1997) (holding that bank with unexercised, inchoate right of set-off against defendant's account does not have standing to contest forfeiture of funds from that account).

For the above reasons, the MSA does not provide NAB standing to contest the forfeiture of the defendant funds.

2.  Constructive Trust Theory

As an alternative argument, NAB claims standing based on a constructive trust theory, relying heavily on the Ninth Circuit's opinion in Boylan.  392 F.3d at 1005.  In Boylan, the Ninth Circuit held that the victims of a mail fraud scheme had sufficient Article III standing to contest the government's seizure of the funds because they were the beneficiaries of a constructive trust.  Id. at 1004.  The court reasoned that "when a fraudster acquires property from a victim by fraud, the fraudster holds the property in constructive trust for his victim."  Id.  Accordingly, the Ninth Circuit concluded that "[i]n the present case, the money fraudulently collected by [the fraudster] was impressed with a constructive trust.  The United

---

[5] NAB asserts that the time of the cardholder's purchase is the relevant date for determining when its interest arose. (Opp'n at 13.)  For the reasons given above, however, this assertion is incorrect.  Neither NAB nor Global had a right to debit Red Rock's account until, at the earliest, the cardholder's chargeback requests was resolved in favor of the cardholder.

9

States, acquiring this property by alleging [the fraudster's] fraud, acquired it with the same trust imposed." Id.

NAB asserts that, like the claimants in Boylan, it is the beneficiary of a constructive trust because the funds were deposited into Red Rock's account as the result of "numerous and discrete illegal, fraudulent, or otherwise improper charges facilitated by Red Rock, LLC in furtherance of its scheme to defraud the cable operators." (Opp'n at 6; Verified Claim ¶ 6.) NAB was a direct victim of this fraudulent scheme, it contends, because Red Rock's improper submission of these illegal charges caused money to be credited wrongfully to Red Rock's account. (Opp'n at 7.)

NAB's reliance on Boylan and the constructive trust theory is misplaced. Its argument is premised on its assertion that it was the victim of Red Rock's fraudulent or illegal cable descrambler scheme. This characterization is not a fair representation of the situation. Unlike the plaintiffs in Boylan, NAB was not the target of the fraudulent scheme and did not part with money on the basis of false representations by a fraudster.[6] To the contrary, NAB was simply a financial intermediary that agreed to indemnify Global against potential chargeback losses.

---

[6] In fact, NAB never directly deposited money into Red Rock's account as the result of any representation or communication by Red Rock. As NAB's counsel clarified at the hearing, it was Global who initially credited Red Rock's account. NAB simply indemnified Global and received the right to collect the chargeback reimbursements from Red Rock's account.

10

Rather than a victim, NAB was actually a conduit, albeit an unwitting one, through which the fraud was perpetuated on the scheme's target, the cable operators. In fact, prior to the government's seizure of the defendant funds, NAB actually benefitted from its relationship with Red Rock. Although NAB may be a victim of the forfeiture, that does not make it a direct victim or target of Red Rock's fraudulent or illegal scheme. The court does not read Boylan as extending standing to all third-party intermediaries or indemnitors who are indirectly harmed by criminal conduct. Accordingly, NAB lacks standing to bring its claim.

B.  "Innocent Owner" Analysis

Even if NAB has standing, its claim fails because it cannot satisfy the "innocent owner" requirement of 18 U.S.C. § 983(d). The innocent owner inquiry is a separate and distinct inquiry from the Article III standing inquiry. United States v. Real Property Located at 5208 Los Franciscos Way, 385 F.3d 1187, 1191 n.3. (9th Cir. 2004). Under § 983(d), the innocent owner requirements differ depending on whether the claimant's property interest in the seized asset was in existence when the illegal conduct giving rise to the forfeiture took place.

Where the claimant's property interest was in existence at the time of the illegal conduct, the term "innocent owner" means someone who: (1) did not know of the conduct giving rise to the forfeiture; or (2) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under

11

the circumstances to terminate such use of the property. 18 U.S.C. § 983(d)(2)(A). In contrast, where a claimant's property interest arises after the conduct giving rise to the forfeiture, a claimant must show that it: (1) is a bona fide purchaser or seller for value; and (2) it did not know and was reasonably without cause to believe that the property was subject to forfeiture. 18 U.S.C. § 983(d)(3)(A).

NAB does not contend that it was a bona fide purchaser. Therefore, to satisfy § 983(d), it must show that its property interest was in existence at the time the illegal conduct giving rise to forfeiture took place. NAB cannot make this showing. Whether based upon its contractual theory or its constructive trust theory, any property interest of NAB in the seized funds arose after the allegedly illegal sale of the cable descramblers.

NAB reiterates its argument that, under the MSA, it retained ownership of money deposited in Red Rock's account until the chargeback period expired. (Opp'n at 13-16.) It contends that it never ceased being the owner of the defendant funds and that its ownership interest, therefore, arose prior to the acts giving rise to the seizure. (Id.) However, for the reasons given above, any contractual interest in the property arose, at the earliest, when NAB became liable for the chargebacks and Global assigned NAB the right to collect the chargeback amount. This necessarily occurred after the sale of the cable descramblers.

NAB's attempted reliance upon the constructive trust theory is equally unhelpful. This theory is premised on the assumption

12

that a customer has purchased an illegal cable box descrambler, that a charge for the purchase has been incurred, and that funds have been placed in Red Rock's account.  NAB claims ownership of these funds under the constructive trust theory precisely because they are the proceeds of the scheme to defraud cable operators, as alleged by the government.  Accordingly, NAB's interest in the funds could not have arisen prior to the illegal acts giving rise to the forfeiture.  See United States v. Hooper, 229 F.3d 818, 821 (9th Cir. 2000) (holding that an property interest in criminal proceeds is necessarily acquired after the offense).

Therefore, NAB also fails to show that it is an "innocent owner" within the meaning of § 983(d).

### III.

For the forgoing reasons, the government's motion is GRANTED.

IT IS SO ORDERED.

Dated: 8/19/2005

_____
DAVID F. LEVI
United States District Judge